Very well. Good morning, Your Honor. This will be argument for 16-30238. Make your appearance. Yes. Ruben Iniguez, counsel for defendant appellant Cyrus Sullivan in 16-30238. The issue in this case, Your Honor, is we're dealing with the occupational restriction by statute 18 U.S.C. 3563b-5 and under the guidelines as well as interpreted therein, 5F1.5. The issue here before the Court is whether the district court erred in finding a direct relationship between the offense conduct, the making of the threat by e-mail, to the business. Mr. Sullivan, in this case, as the Court, I'm sure, is well aware, was the owner and operator of a website. And the Court's finding here was exactly this, and I'm referring to the ER at 142. This whole event arose because the defendant was running this particular business. It was a direct relationship between the business and the conduct. And that simply is not enough, Your Honors. You know, it's true, Mr. Sullivan was the owner and operator of the website, and it's true that that's how these two parties came to interact. But that's the end of it. So the idea, what we have here is quite a bit of intervening events, including, most notably, the conduct of the victim here, whose conduct was certainly not beyond reproach. You know, in this case the one could say this is a very interesting website. I mean, they were quite interesting. I didn't use one word for it, Your Honor. Yes. I didn't know these kind of websites even existed, but it just goes to show I'm kind of out of it when it comes to the World Wide Web. But I thought there was other evidence in the record that showed that people who had experience with this particular website had complained extensively about this website. And that this incident was one manifestation of the concerns that people had with the nature of this website. And that's the concern that the district judge was trying to deal with when they granted the modification of special condition number 8. Isn't that right? I mean, isn't it related to the conduct? There's a tangential and incidental relationship, I would grant that, Your Honor, but there's not a direct relationship. And you're correct. In the record, and this is in the government's brief, the government pointed out in their brief at page 16, referencing the ER at 12, Mr. Sullivan, because of this website, which did gain notoriety, even appeared on CNN, Anderson Cooper's show. And it was announced there that there had been, quote, complaints from people literally around the world. And I think that that fact, that evidence, favors Mr. Sullivan. And here's why. Having complaints from around the world, and again, this website was operational for almost five years, so there were thousands upon thousands of users registered to this site, yet we only have one incident, one incident that results in this kind of a threat. So I think that the fact you have thousands of users from around the world complaining demonstrates that Mr. Sullivan, this issue here arose out of the particular nature of the interaction between these particular two individuals. And as I say, this victim, one, committed a crime. She called 911, made a false report, and in Oregon, that's a class A misdemeanor. As I understood, the way this website operated was that if somebody called him to complain that the information was inaccurate, he required proof that they didn't have an STD, and he required a payment. Both. It's easy to understand how a person who might have been in the situation of this person, of AK, any other AK out there, any other individual, would be quite outraged at this kind of thing. And might just, you know, it seems reasonable to me that somebody would react in this kind of manner. Well, that may be true, Your Honor. And here's what I would say, is, you know, there were in fact three different ways. The payment came later. Initially, there were two ways a person could get this information removed. And I would make one important factual note. It's not Mr. Sullivan who posts the information. He is simply hosting this website. He's the owner-operator. Other people, anonymously, can post information about a third party. And the first way to have that removed under the policy of the website was you contact that person and request that they remove it. That person then has the ability to remove it. In fact, here, the former boyfriend of AK. How can you contact an anonymous posting? Well, Mr. Sullivan, in the end, will know where it's coming from. So, for example, for example. Was there any issue about whether he gave the name of the person who opposed, who did it? Your Honor, in fact, here, we know who posted the information. That individual, the former boyfriend of AK, was prosecuted for identity theft in Multnomah County. He was ordered as part of his plea agreement, or he agreed as part of his plea agreement, to remove the posting. That's how this started, in fact, because he was contacting Mr. Sullivan to remove the posting. Then AK got involved. But that, as I say, that's one of the ways to remove the information. The second way was to, as you reference, Judge, to provide information verifying that, in fact, the information was false, that you do not have an STD. The third one came later, when he developed this other website, the nolimitless.com, and there you could pay Mr. Sullivan to essentially block, when somebody searched Google, another, you know, website, that this would block the information from showing up. That was the for fee. Again, here, he did not post the information. But the victim, AK, did post information. That's how this escalated, right? She not only went to the Multnomah County Courthouse and obtained personal identifying information for him, she then went out of her way to post that on not one, but two online fora. She then calls 911 and says he's holding hostages at his mother's house. And SWAT team reports she also creates not one, not two, but three separate YouTube videos where she uses defamatory language, calls up a slew of names that are in the record, and this is what escalates the tension between these two. It's true that they meet through the business, but the way that we get to the making of threats is by virtue of their mutual and the animus that they have in this interaction. But our case law is very generous in the way we allow district judges to impose conditions of supervised release, special conditions of supervised release like this one. And one of the key tests is whether it all relates to the offense conduct. Here, Your Honor, I would say first of all, I agree, generally we're very generous. Because this is an occupational restriction, however, it's subject to heightened scrutiny, special scrutiny. And here we even get into issues bordering on First Amendment rights. So the burden is even higher here. Now, what I would say is, yes, it has to relate to the conduct. And here, this is based on personal conduct. I would ask the Court, I think the most analogous case that the parties are discussing was the Wittig case. I believe it's out of the Tenth Circuit. It's discussed in the opening brief. Like Wittig, this is based on personal conduct of Mr. Sullivan. It's not his conduct as owner and operator of the website. So to say you cannot go back to this former occupation and do this with anybody when you have one problem with one person who engages with you in this particular manner is over the line. It's not enough. Okay. Why don't you save the balance of your time for rebuttal? I will. Thank you, Judge. Let's hear from the government on this case. May it please the Court. Kelly Zusman appearing on behalf of the United States. Your Honor, the statute in this Court's case law recognized that trial judges need to be afforded a great deal of discretion when it comes to figuring out what are going to be the conditions  that Mr. Sullivan is going to be successful while he's on supervised release. And that's precisely what Judge Hernandez did in this case. Now, Mr. Enigas, I think, has done a good job of highlighting very specific details about this offense. He only threatened to kill one person who visited that website. And that's true. But Judge Hernandez was not confronted with someone who had merely engaged in one online threat. We know that subsequent to that, he threatened Judge Skye when he made his appearance over in Multnomah County. He is, in fact, engaged in other assaultive behavior. And the record was filled with psychological reports about Mr. Sullivan and how he is particularly susceptible to getting back at people. He has a hair-trigger temper. So I think what Judge Hernandez did here was, in fact, a very narrow, in light of subsequent events, perhaps too narrow restriction on Mr. Sullivan's ability to go back and operate his websites. He didn't preclude him from going back into the computer industry. He didn't preclude him from a wide range of activities. And, in fact, I think he reasonably drew an analogy to the bank robber who is an alcoholic. Drinking alcohol is legal. But for some of these defendants, where there is a connection between their personal characteristics and the crimes that they commit, it makes sense to impose reasonable limits of this kind. We believe that the record fully supports what Judge Hernandez did. Yes, Your Honor. I think we received a 28-J letter on this case. That's correct. Correct. Indicating that he may have violated the terms and conditions of his supervised release. He did. And, in fact, Judge Hernandez — Has it been — have the terms and conditions — has the supervised release been revoked? And I can't answer that. I know Judge Hernandez found that he did, in fact, violate the conditions of his supervised release, and that was condition number seven, relative to the computer monitoring software. Mr. Sullivan removed that. Judge Hernandez made that finding. Now, Mr. Sullivan is in custody on new charges, and those are five Federal assault charges that are pending now. But if — we don't know if Judge Hernandez revoked supervised release, this one we're dealing with. That's correct. Because if he revoked it, then this might be moved. Well, and I believe, ultimately, it probably is, because he's — and, unfortunately, Mr. Sullivan has engaged in so many different things here that we're sort of layering on. But while this appeal was pending, his supervised release, there was a violation report. He appeared before Judge Hernandez. Judge Hernandez found that he had violated his supervised release, and while he was in custody on that violation, he — at least we have charged him with new offenses, and that's the five assault charges involving the guards. Judge Hernandez could have found him in violation of special condition number seven and just, I don't know, do whatever he was going to do, but reinstated supervised release in this case, leaving special condition number eight in play. Right. But I don't believe — Or he could have revoked the whole thing. I don't think he's gotten there yet. Again, because of the new charges, he's being held in bail on the new charges. But the bottom line, though, and the reason I sent the letter, is that Mr. Sullivan is not presently on supervised release. I don't know when he's going to be back on supervised release, because in addition to the violation — But he's being held on — is he being held on this case that we have in front of us, or is he being held on the new case? I believe he's being held on the new case. His bail was denied. And that's the appeal that was just filed, and the briefs are going to be coming in in the next week or so. So when somebody goes in custody on a new case, and they're on supervised release on a prior case, what happens to the status of supervised release in the prior case? It stays. His term is told, because he's not on supervised release. He's in custody. Well, I'm not familiar with exactly where you get the term told, but — Well, maybe suspended is a more accurate term? I have no — I'm just — I'm asking the question, because I have no idea. But the reason that I sent the letter was the concern is that this is — his conditions of supervised release is a — become a dynamic process. And the fact is that until he resolves both his supervised release violation and the new pending charges, we don't know what his conditions are going to look like. And I think in the light of subsequent events, if he is found guilty of those new assaults, his conditions are going to be different. They're going to be more restrictive than what we see here today. Maybe you could do us a favor and check the district court docket in this case and see if supervised release has been revoked. I will do that, Your Honor. And let us know by letter. Sure. I will do that. Unless there are further questions, the government would — Jim, I would like to address what Mr. Iniguez said. This condition number eight seems to put Mr. Sullivan out of business completely. In terms of operating his former website, that's correct. It is both direct and indirect. And isn't that a restriction on his free speech? I would say no, not on his free speech. As Mr. Iniguez has described, Mr. Sullivan himself wasn't posting any of this material. He was simply hosting the website and would be others' First Amendment interests in posting the material. But he was also — he could provide information to — he could ask for information, and he could make the determination whether to take something off his website. That's correct. I would say he's not raised a First Amendment — That's not expression. I'm sorry? That's not expression. He's not raised a First Amendment argument with this appeal. His argument has been that you can't restrict my ability to go back to my specific business. And our position has been Judge Hernandez left open the entire field of computer science and programming, and even web hosting. It's only this particular type of web hosting that Judge Hernandez described as inviting conflict, which it clearly did. And he can still do that with approval of his probation officer? Correct. Okay. Unless there are further questions, the government would submit. The problem is that this is the occupation he had. It's not enough to say you can go out and use computers to do other things. This is the former occupation. This is how he made his livelihood. That's what's being restricted. A number of things that were mentioned here, but I would say this. that the district court made below, and that is trying to point out other acts, including what the current status says, including referencing what happened with Judge Skye in Multnomah County. I would refer the Court to the Britt case out of this circuit, 332F3rd. It's discussed on page 21. And there, what the Court said is that you can't — Although supervised release conditions can generally be based on a defendant's criminal history, 5F1.5, which we're dealing with here, limits occupational restrictions to those based on the offense of conviction. So that's the problem. You can't consider, although for other purposes, other conditions, you may be able to consider the person's background, history, characteristics. For this purpose, is there a direct relationship between the offense of conviction and this restriction? And I'm submitting that there is not. Now, Your Honor, I would say this. Think about other websites, because the problem here is that this website may be distasteful or repugnant to some. Some of us are better familiar with things like Yelp. So anonymous users can post information and say, I hate that restaurant. I had terrible service. It's lousy. Don't go there. Disrupt their business. And the owner can say, well, wait a minute. And they might get into a dispute. And years later, as in this case, two years later, after all these interactions escalate, then the owner of the restaurant sends a threatening e-mail communication, and we're going to say, you had a problem with one person who posted information on Yelp, and now you can no longer operate Yelp? It just doesn't make any sense. There's other websites. Bedbugregistry.com. People go to hotels. They travel around, and they try to figure out, is this hotel clean or are there bedbugs? They post information. Again, the post of that website, if they get into an altercation with a hotel owner who disputes that posted information, we can't just shut them down and say, you can't do this line of work anymore. Roberts. Okay. Thank you, Mr. Inneges. Thank you, Judge. Thank you for the arguments. This case is submitted, so we'll turn to the other case involving Mr. Sullivan. May it please the Court, Counsel, I'm Federal Public Defender Lisa Hay representing the Petitioner, Mr. Cyrus Sullivan, on this petition alleging claims of ineffective assistance of counsel. I'd like to reserve four minutes for rebuttal, if I may. The certified issue on appeal addresses ineffective representation relating to a flaw in the charging instrument. The superseding information to which Mr. Sullivan pled guilty was defective because it failed to include the mental state required in this circuit. Counsel was either unaware of that flaw or failed to apprise Mr. Sullivan of the flaw. But in either case, he failed to take advantage of that flaw to Mr. Sullivan's benefit. I'd like to address the flaw in the information first, in case there are any questions on that, and then turn to the benefit that counsel could have received or could have secured for his client. So the flaw itself, this circuit requires clearly that the government prove specific intent to threaten when it seeks to criminalize communications under 18 U.S.C. 875. That specific intent to threaten is required by a long line of this circuit's precedents. I cited Twine. In my 28J letter, I added King. And it's also required by the First Amendment. And there are cases in my brief addressing that. The district court recognized that the information in this case failed to include this mens rea element of intent. But then the district court ruled that the information was nevertheless not defective. And that's in the opinion at ER 35. So I wanted to be sure on de novo review that this Court not find that reasoning persuasive and say this information was, in fact, defective. The district court incorrectly, I think, relied on the word knowingly in the information and felt that maybe the word knowingly would be a sufficient mens rea. That argument, I think, can be rejected easily based on the Supreme Court's recent reasoning in Ilanis. The Supreme Court there addressed some of the same arguments. The government suggested that if the defendant knows the content and the context of the communication, that should be enough. And the Supreme Court rejected that specifically. After Ilanis was decided, the Supreme Court also vacated and remanded a case, U.S. v. Martinez, that we cited in our brief. In that one, the indictment was similar. It said knowingly. So I think it should be clear that this information was defective. And I would address any questions the Court has on that. So does it make any difference that at the plea, they didn't raise this issue with the district court judge at the time of the plea? Does the fact that he enters the plea, does that sort of waive any objections to the content of the information? Our argument would be no under Rule 34 of the Federal Rules of Civil Procedure of Criminal Procedure. But I did want to point out we're not raising an argument that he should have objected. There's a line of cases that address indictments. And we're not raising an argument under that line of cases because, of course, he did waive indictment and the grand jury protections. So under that line of cases, he would have had to make a timely objection to a flaw in the indictment. And we're not following that line. That's sort of Dubot, Omer. But under a narrow reading of Rule 34, we believe that there was still a role that the defense attorney could have played here. And that's because when Mr. Sullivan pled guilty, Rule 34 had not yet been amended. And it allowed a defense attorney to raise an objection that an indictment or information fails to state an offense after plea. Suppose at the plea colloquy or at the, yeah, I guess at the plea, he said, Judge, I want to bring up something with you, Judge. This information doesn't have the mens rea alleged. Sure. We object to that. What do you think Ms. Sussman would have done, her staff would have done? Judge, this information, we'll just write it in right now if that's okay. Exactly correct, Your Honor. So what's the problem here? So the issue is there was an interesting interregnum under Rule 34 that maybe you would call it a loophole, maybe you would call it a protection of the public to be sure charging documents are correct. But Rule 34 did allow at that time a defendant to make an objection under Rule 34 after the plea. And it was amended later. It was amended in 2014. You can't do that anymore. But at the time you could. And so clearly if the defense attorney had raised the problem before plea, I agree the government would have simply interlineated it. But that's why his attorneys should have taken advantage of this technicality. They should have done it after the plea. But what you're saying is that he should have remained silent, which is what he did. That makes no sense. Well, he should have remained silent, but after the plea he should have filed the motion. After the plea he should have filed the Rule 34 motion to say now jeopardy is attached, you've made a mistake, government, and now this count has to be dismissed. It's an odd trap. I cited for you, though, the case of United States v. Shaw. It's a case from this circuit from 1981. And this is exactly what happened. The defense waited until the conviction had — the plea had entered, the defendant had been convicted. They filed a motion under Rule 34. The government was up in arms. They said we've been sandbagged. This is fraud on the court. You knew you were going to do this. And this Court said no. Rule 34 says the defense attorney is permitted after plea to file a motion saying the indictment fails to state an offense or the information. And so I guess my point is — Well, what you're saying is he was ineffective by not filing a rule — a motion under Rule 34 after he pled guilty. That's the ineffectiveness. Well, the ineffectiveness is sort of surrounding the issue of not identifying the flaw in the information and then the prejudice that followed. Well, let me ask — there's one other thing I want to ask you. And that's — I thought I read that in the plea agreement, the government did lay out the proper elements of the offense. The government did in the plea agreement. And in the plea hearing, there are two different documents, which gets a little confusing. The defense attorney presents the plea petition, and the government has written a plea agreement. Right. The defense attorney's plea petition was not accurate. It had the wrong elements. That's correct. And the plea agreement had the correct elements. I think when the district court refers to the plea colloquy with the defendant, the page numbers show that the judge did not start with the plea agreement. The judge started with the plea petition. So in the full analysis of do you understand what's happening, the judge is actually referring to the plea petition, and the defendant says, yes, I understand those. So I think there's room for believing that there's confusion. I read the colloquy a while ago, but I can't remember now whether or not the judge actually said, have you reviewed the plea agreement. Yes. It did ask, have you reviewed the plea agreement with your counsel? And did you listen to the attorney, the government, go through the plea agreement? So the question of notice is not the prejudice that I'm arguing today, because I understand the district court ruled against us on the notice. But the argument here is the district court certified it for appeal, this issue of the flaw in the indictment, the overall flaw in the indictment or in the information, excuse me. And I'm arguing the information clearly was flawed, and there is a prejudice that resulted from that. If his attorney had filed the motion, he would have gotten the benefit. So I thought your whole argument was, and forgive me if I misunderstood the briefs, but I thought your whole argument was that the lawyer was ineffective because he didn't properly advise his client, Mr. Sullivan, that there was a mens rea element that was required to be alleged in the information. I thought that was what your theory was. Not that he was ineffective because he failed to file a Rule 34. Right. The issue, the government responded, I believe, to the non-certified question from the district court. The district court looked at the question in two ways. And understandably, Mr. Sullivan filed 300 pages of pro se pleadings. There were 11 claims that the district court winnowed down. And in this order, it addressed this in two ways. One way, the district court said, was Mr. Sullivan prejudiced or was counsel ineffective for not notifying Mr. Sullivan of the mental state? The district court ruled against Mr. Sullivan on that and did not certify that question. So the question of whether Mr. Sullivan was notified by his counsel was not certified. The district court also said the other issue raised is, was the district, was the attorney ineffective in not addressing this defective information? And the district court certified that question. And my argument is that if the information was defective, the prejudice that Mr. Sullivan suffered was that his attorney then did not file a Rule 34 motion. Okay. Thank you. I got it. May it please the court. Kelly Zusman, appearing again on behalf of the United States. First, the Rule 34 motion. And I think the reason for perhaps my confusion and the court's confusion is this. Judge Hernandez did not certify the Rule 34 issue. This is an excerpt of Record 45. The court certified whether Olson was ineffective in advising defendant to plead guilty to the superseding information, which did not expressly recite the element of the crime regarding the intent to convey a threat. Mr. Sullivan raised the Rule 34 issue 19 days after Judge Hernandez's ruling. And that is at ER 14. So this whole notion that Mr. Olson was ineffective because he didn't do a gotcha on the government. He didn't wait for Mr. Sullivan to enter a guilty plea and then say, okay, jeopardy is attached. I'm filing a Rule 34. So dismiss and we win and he gets to walk away. That was never a certified issue and that's why it hasn't been squarely addressed. Now, I'm prepared to answer that today, which is that scheme wouldn't have worked. The Shaw case that Ms. Hay relies upon involved a jurisdictional defect. And we know that a guilty plea waives all non-jurisdictional defects. It doesn't waive jurisdictional defects. So Shaw recognized that a jurisdictional defect was one that could be raised by a Rule 34 motion. But going back to Tollett v. Henderson in 1973, this court has followed the rule that once you enter a guilty plea, you're done. You have waived all non-jurisdictional antecedent defects, including the omission of an element from a crime. And that's United States v. Cotton that held that. So I get the Rule 34 scheme. It wouldn't have worked. The only certified issue was whether or not Mr. Olson should have pointed out to the court that there was an error in the superseding information. Judge Hernandez answered that. He said precisely what you said. Government would have easily, under Rule 7e, made a change to the information and we would have proceeded on. I think the other important distinction between this case and many of the cases that was, in fact, an information that resulted from a series of settlement discussions. Mr. Sullivan agreed to plead guilty to this information in exchange for our dismissal of an indictment that carried more serious charges. So to say that Mr. Olson was ineffective for first negotiating a deal to an offense that carried a five-year max as opposed to 20-year maximum sentences, and then at sentencing the judge to go down six levels on sentencing enhancements, getting his guideline range down to 18 to 24 months, that's outstanding behavior on the part of the Sentence Council and certainly not ineffective. And Judge Hernandez made detailed findings on why any error in this particular information was completely harmless in light of Mr. Olson's eight-page sentencing letter that he explained he went into with great detail with Mr. Sullivan and the sentencing memo, which also touched on issues of specific intent. No question, according to Mr. Olson, that a key feature of the settlement discussions between the parties was about specific intent and the fact that Mr. Sullivan had this potentially viable diminished capacity defense that he might have phrased. But we know that Mr. Olson took that into account in advising his client that this was the soundest course. So there was no ineffective assistance of counsel here, no deficient performance, no prejudice, and Judge Hernandez's ruling should be affirmed. We don't even have to get to the ineffectiveness argument if there's no prejudice, right? Correct. If there's strictly, you can go right to the second element. And back to the Rule 34 argument, we shouldn't even be considering that here. Correct, because it hasn't been certified. Okay. Thank you. Thank you, Ms. Sessman. I'd like to just respond on the question of certification, because I think there is confusion there. The district court clearly looked at this question about effectiveness at the plea in two different ways. One was whether Mr. Olson gave notice to the client about the mens rea requirement. And that's the question that the district court did not certify. And that's on page 35 and 36 of ER, the judge is going through those issues. On the question that he did certify, the question is about the advice to plead to this defective information. But the court also addresses whether Mr. Olson failed to recognize the flaw in the information in the court room. But the issue of challenging information came up. I think these are pro se pleadings. We can expand the arguments about prejudice to include this Rule 34 argument. As Ms. Sessman says, the 34 argument was raised after, by the defendant in later pleadings, after the court had ruled. But I think the argument about prejudice can still be made. Any argument about prejudice can still be made. His attorney filed a Rule 34 motion. It was granted. The government said, you're sandbagging, it's fraud. But this court said, no, you're allowed to do that under the way Rule 34 existed at the time. I'm not saying that's good public policy, but the rule did allow a defense attorney to file a motion within 14 days after a plea to throw out a count if the government had incorrectly pled. I think it's similar if a defendant goes to trial on a bank robbery case, for example, and the government doesn't include the FDIC element in their indictment. The defense attorney is certainly allowed, and should, sit on their hands, watch the government fail to prove the FDIC element, and then after the government's rest, move for a judgment of acquittal. That's similar to sandbagging. The defense knew the whole time. They hadn't pled it right. They weren't proving it. And yet you get that benefit for your case. Okay. 270 is submitted at this time.
judges: Paez, Bea, Anello